# *Law Offices of*
# *Daniel A. Hochheiser*
ATTORNEY AT LAW
2 Overhill Road, Suite 400
Scarsdale, New York 10583
dah@hochheiser.com
(646) 863-4246

May 7, 2024

**Via ECF**
Hon. Philip M. Halpern
Southern District of New York
United States Courthouse
300 Quarropas St.
White Plains, NY 10601-4150

Re:   *USA v. Justice Jackson*, 22 CR 641-006 (PMH)
      SENTENCE MEMORANDUM

Your Honor:

## I.   DEFENSE SENTENCE REQUEST

Justice Jackson requests a total sentence of no more than 140 months of imprisonment, along with a five-year term of supervised release, a $200 special assessment, and, if warranted, appropriate orders of restitution and forfeiture. This proposed sentence would constitute a sentence "sufficient but not greater than necessary" to satisfy the purposes of sentencing. 18 USC §3553(a). A sentence of 140 months would: (i) be a sentence 20 months greater than the applicable 120-month consecutive, mandatory minimum applicable to Count 3 [18 U.S.C. §924(c)(1)(A)(iii)], (ii) account for Justice's role in the racketeering conspiracy, and also, (iii) balance the mitigating factors of his (a) childhood marked by poverty, neglect, domestic violence and a crime-ridden neighborhood, (b) loss of his father's guidance (c) young age at the time of his crimes (d) positive post-arrest conduct, (e) prompt acceptance of responsibility, and (f) acknowledge the continued support he has from relatives and friends.

## II.   BACKGROUND

For a detailed account of Justice's history, please see the January 24, 2024 mitigation report by Louise Luck of Court Consultation Services. **Exhibit A**[1].

Justice was arrested on a Hobbs Act robbery case on December 22, 2021 (22 CR 47 KMK) which is relevant conduct to the instant racketeering case for which he made his initial

---

[1] Luck's report will be referred to hereinafter as "the mitigation report".

1

appearance on December 14, 2022. "…(T)he parties stipulated that the factual basis supporting Count 2 of Indictment 22CR47(KMK) is relevant conduct to Count 1 of Indictment 22CR641(PMH), pursuant to USSG §1B1.3." PSR ¶14. At the time of his arrest on the robbery case, Jackson was 19 years old. During the period of Justice's participation in the Racketeering Conspiracy (2018 – 2021) he was 16 to 19 years old[2]. At the time of sentence scheduled for May 28, 2024, Jackson will be almost 22 years old. He has been incarcerated for almost 2 ½ years in his two related cases pending in this courthouse. *U.S. v. Ward*, *et al.*, 22 CR 47 KMK. *U.S. v. Williams*, *et al.*, 22 CR 641 PMH.

> Justice Jackson is a twenty-one-year-old young man from the City of Newburgh, New York. When Justice was only two years of age, his father, Anthony Rashad Jackson was shot and killed while sitting on his aunt's porch. His mother, Nakia Nolcox, at the time of the shooting, had five children and was pregnant with her sixth child. Nakia Nolcox suffered from a very traumatic childhood. She was ill-equipped to prepare her children for their life ahead. *See* the mitigation report at 1.

Justice was born into a family with a history of teen pregnancy, drug addiction, violence, sexual abuse, suicide attempts, instability, and chaos. Justice was the fourth of five sons born to Nakia Nolcox. He was born on            2002. On August 17, 2004, Justice's father was shot and killed in Newburgh. Justice lost his father as a two- year-old toddler. He has no memory of his dad. PSR ¶152. The murder not only eliminated Justice's father, but also profoundly affected his mother's mental capacity to care for her five sons and her daughter -- born shortly after Rashad's murder. Justice's mother was rarely home as she was always working and often went out at night. She worked at Walmart and as a nurse when Justice was a child. She left him to be "watched" by older cousins. During his childhood there were times when the family did not have enough food and "on occasion, the lights would go off, but then his mother would immediately pay the electric bill." PSR ¶156. At times, Nakia acted as a peer to her children instead of as their mother. She would drink and smoke with her children. After Rashad's death, Nakia's relationships with men brought intoxication and domestic violence into Justice's household. PSR ¶157. Justice was exposed to violence inside his home. And to an even greater extent, he was affected by exposure to frequent, severe, violence outside his home. Justice grew up in a terrible neighborhood in Newburgh where there were frequent shootings

> Jackson described his childhood neighborhood as violent. Prior to the instant incarceration, he has witnessed at least thirteen shootings, and he recounted some of the incidents, as follows. When Jackson was 8 or 9 years of age, "Sam" was shot on his street (South Miller Street in Newburgh) while his mother was sitting on the porch. Jackson's mother tried to help the injured individual and instructed

---

[2] "As we know brain maturations continues well into ones mid-twenties. Justice was clearly in the lower end of the process when the instant offense occurred." *See*, the mitigation report at 14. *Also see,* The Anxious Generation at 5, J.Haidt (Penguin Press 2024)[ "While the reward-seeking parts of the brain mature earlier, the frontal cortex – essential for self control, delay of gratification, and resistance to temptation – is not up to full capacity until the mid-20s…"].

> the children to fetch towels. When Jackson was age 13, an older man in the neighborhood was shot on Liberty Street in Newburgh. At the age of 15, while sitting on his porch, Jackson witnessed his neighbor get shot during a drive by shooting. PSR ¶158.

Justice's maternal grandmother, a positive influence in his life, died "unexpectedly of cardiac issues" when Justice was only 10. At age 12, two years after the passing of his grandmother, Justice was adjudicated a Juvenile Delinquent by the Orange County Family Court for a burglary for which he was sentenced to a conditional discharge. PSR ¶141. He did not succeed in school.

> Justice had learning disabilities and did not excel in school. Academics became a source of frustration and disappointment in his life. Coupled with the chaos at home, he had little opportunity to overcome his educational challenges. His mother recalls that it was hard to get him up for school and she would throw a glass of water in his face to get him up. A far cry from positive parenting. <u>The mitigation report</u> at 14.

He was expelled from the Newburgh Free Academy in the ninth grade. His expulsion followed his argument with a school security officer during an altercation between his female cousin and a third party. PSR ¶167. Twenty-two days after the incident in school, Justice tried returning to school but was not permitted to continue attending ninth grade. His loss of his place in school was exacerbated by additional loss of family. In 2018, when Justice was 15, his Aunt Esther passed away. Her passing constituted the loss of another positive influence in his life. After the passing of Esther, Justice's situation as a teenager continued to deteriorate.

> The use of drugs was normalized both in the home and the surrounding environment. Justice started smoking marijuana from the time he was very young and by the time he was sixteen or seventeen was smoking on a daily basis. By eighteen he was abusing "Lean" a cocktail made by combining one of more cough medicines usually containing codeine phosphate and promethazine syrups. *See*, <u>the mitigation report</u> at 10.

He also abused Percocet pills. Apparently, Justice used drugs as a teenager to "cope with trauma and stressors." At 18 years old, he was adjudicated a youthful offender for a criminal mischief case and was sentenced to a conditional discharge. Also, at age 18, Justice lost his friend Amari Edwards, who was shot and killed at the young age of 22. PSR ¶159. Justice cried for a week after his friend's death. As a 19-year-old, on October 6, 2021, a couple of months before his arrest by the feds, Justice was arrested for a state gun case (Glock .40 caliber pistol) in Orange County. He pleaded guilty in the Orange County case; his sentence is pending. PSR ¶143. A warrant was issued by Orange County despite Justice's federal incarceration at Hudson Jail.

Justice pleaded guilty in the instant case on December 1, 2023. He was the first named defendant in the instant 14-defendant racketeering indictment to accept responsibility for his crimes. Despite his substance abuse, federal convictions and incarceration, Justice still has the

support of many including his girlfriend Chanel Tate who sees the good in Justice and wants "to be around him in the long term."

Growing up without a father and left with a neglectful mother, who was overwhelmed trying to raise six kids by herself in an environment of poverty, violence, drugs and instability, Justice was tragically, but not surprisingly, drawn into the ambit of a street gang. His involvement in the a gang inevitably led to his arrest, conviction, incarceration, and imminent sentencing to a mandatory minimum of 10 years in federal prison. Because "…his father was not there to teach him to ride a bicycle, change a tire, secure employment and/or stay off the streets…the older guys on the streets became [his] father." PSR ¶152 (internal quotations omitted).

Justice's story began as a two-year-old when his father was murdered and culminated in his federal arrest as a 19-year-old. The story of Justice's young life is an unfortunate, all-too-common one in which a young, black man grows up without a father, in a crime-ridden environment, like Newburgh, and is then drawn into the streets where the gang becomes his parent, drugs become his meal ticket, and jail becomes his logical destination. Counsel acknowledges that some of Justice's siblings did not succumb to the lure of the streets of Newburgh. Justice did, however, perhaps because of his position in the family as the youngest of five boys who looked up to his older brother Messiah who is a co-defendant in this case.

Justice's post-arrest conduct has been exemplary with one exception. PSR ¶68. Counsel's qualification of his post-arrest conduct is made only in-light-of an isolated, minor, disciplinary incident at the Hudson Jail for which Justice served five days in the special housing unit. Overall, Justice has behaved well and done better than most inmates faced with navigating through difficult, dangerous, jail conditions for more than two years.

### III.   HARSH CONDITIONS

Justice has been incarcerated at Hudson Jail in Kearny, New Jersey for the past almost 2 ½ years. He has been subjected to harsh conditions including only being allowed outside twice per week during periods of his incarceration. His participation in GED classes ended because the jail stopped providing the classes. The time Justice served includes hard time served during the Covid-19 pandemic. This includes a recent spike in the virus at the jail as recently as December 2023 which caused the cancellation of "All non-essential services, like educational, life skills, and community reintegration programming…[3]" Justice has suffered harsh conditions in the form of lack of programming, lack of educational opportunities and limited movement, in part, driven by Covid-19 protocols. Justice did not get a contact visit from his mother for almost two years as a result of Covid visitation restrictions. **Exhibit B**.

The Court has authority to grant leniency at sentencing based upon harsh conditions suffered during pre-trial confinement. *See*, *USA v. Stubbs*, 19 CR 276 (NSR)(ECF 68). Courts in this circuit have granted sentence reductions for harsh conditions of pre-trial confinement. *See*,

---

[3] https://www.nj.com/hudson/2023/12/covid-19-on-rise-again-in-hudson-dozens-of-cases-force-shutdown-of-programs-at-county-jail.html&subscribed=auth0%7C6637cc9b13a26147ac57e117

4

*United States v. Sanchez-Reyes*, 19 Cr. 502 (DLC); *United States v. McRae*, 17 Cr. 643 (PAE); *United States v. Guagliardo*, 20 Cr. 23 (DLC); *United States v. Hengy*, 19 Cr. 120 (CS); *United States v. Bryon*, 19 Cr. 700 (VB); *United States v. Marmolejos*, 19 Cr. 626 (PAE); *United States v. Nash*, 20 CR 327 (VB). For example, on July 21, 2021, Judge Briccetti sentenced Nash to a below Guidelines sentence, in part, because of the harsh conditions extant at WCJ during the pandemic. "It's also relevant to sentencing that the Defendant has endured unusually harsh conditions of confinement of during more than a year in custody during a pandemic." 20 CR 327 (VB)(Sentence Transcript, p.36).

Harsh conditions (related to the Covid-19 pandemic) suffered during incarceration at the Hudson Jail and other jails in the metropolitan NYC area may be considered in the Court's analysis of the 3553(a) factors. *United States v. Lawrence*, 2024 U.S. Dist. LEXIS 77892, at *13 [20-CR-293, E.D.N.Y., Apr. 25, 2024]["…defense counsel explains that Defendant has already been in jail for over 31 months, in both the Hudson County Jail and the Metropolitan Detention Center, where he has experienced harsh conditions. Defense counsel notes a good portion of Defendant's time in custody to date was spent dealing with the effects of the COVID-19 pandemic, which he explains were particularly difficult for those who were incarcerated. Defense counsel notes the increased lockdowns, the lack of protective supplies, and the high risk of disease and infection at that time made life even more miserable than usual." (internal quotations/citations omitted).]

Like other defendants, who have received a measure of leniency due to harsh pre-trial confinement conditions, Justice also deserves leniency commensurate with the hard time he served and continues to serve during the lingering issues caused by the Covid-19 virus which makes life inside jail even nastier than is typical.

**IV.    RECOMMENDATION OF PROBATION**

Probation recommends a sentence of 240 months of imprisonment. This sentence would be a sentence greater than necessary to satisfy the purposes of sentencing. The purposes of sentencing are to: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

Given Justice's prompt acceptance of responsibility, positive post-arrest conduct, bleak childhood circumstances, lack of guidance due to his father's murder and his mother's neglect, his young age (16-19 years) at time of the offense, his community support, and his future potential, a sentence closer to 120 months than 240 months would be a sentence sufficient, but not greater than necessary to satisfy the purposes of the sentencing statute. Balancing the various factors at play in this case, a total sentence of 140 months is appropriate given that it would be Jackson's first custodial sentence and would be a sentence amounting to more than half his life. Imposing a sentence of almost 12 years on a 21-year-old is significant punishment which serves the objectives of the sentence statute without foreclosing a young man's hope to salvage the future. A sentence of 140 months would result in Jackson's release from prison around the time

of his 30th birthday. At 30-years-old, Jackson would likely "age-out" of the street life and be ready to focus on his future plans. "Jackson would like to own a landscaping company; he enjoys the outdoors, being active and performing labor-type work." PSR ¶164.

## V.   THE STATUTORY FACTORS

The sentencing statute, 18 USC §3553(a) sets forth the factors "to be considered in imposing a sentence." Since the Supreme Court decision in *U.S. v. Booker*, 543 U.S. 220 (2005), the United States Sentencing Guidelines are no longer mandatory and now are only advisory. The Guidelines may be a starting point for federal sentencing courts, but in the post-*Booker* world, the Guidelines are merely one of various factors to be considered before imposition of sentence. *U.S. v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Moreover, the parsimony clause of §3553(a) requires a sentencing court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)…" The parsimony clause dictates that in the event a sentencing court concludes that two sentences equally serve the statutory purposes of §3553(a), the court cannot, consistent with the parsimony clause, impose the higher sentence. *U.S. v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006). "The court, in determining the particular sentence to be imposed, shall consider" seven enumerated factors:

(1) <u>The nature and circumstances of the offense and the history and characteristics of the defendant</u>

***Nature and Circumstances of Offense***

Justice, as a 16-year-old, joined the street gang known as the "Double Nine Grim Reapers" aka "Grimz". Grimz is an enterprise that engaged in various violent and non-violent crimes through a pattern of racketeering activity in Newburgh and elsewhere. Jackson's role in the offense is described at PSR ¶84.

> With respect to the attempted murder of a rival gang member on November 3, 2020, the victim sustained life-threatening injuries and was air lifted from a local hospital to the Westchester Medical Center; the victim survived. Regarding the robbery of a marihuana dealer on November 10, 2020, a firearm was discharged, and the victim sustained bodily injury (gunshot wound). Concerning the robbery of a drug dealer on October 31, 2021, a firearm was otherwise used (pistol whipping), and the victim sustained bodily injury when he was stabbed in the leg. With respect to the narcotics conspiracy, JUSTICE JACKSON is accountable for the distribution of at least 15 kilograms of marihuana, at least 500 grams of crack cocaine, at least 200 grams of Oxycodone, and at least 1 ounce of K2, a synthetic cannabinoid. JUSTICE JACKSON possessed firearms while these narcotics were sold, and the Grimz Enterprise's sale of K2 involved the distribution of K2 in prison by other members/associates of the Grimz. A role adjustment is not warranted for JUSTICE JACKSON.

Justice accepted responsibility for his role in these crimes during his guilty plea allocution (PSR ¶89).

> Concerning Count 1 of Indictment 22 CR 641, from about 2018 through my arrest on or about 20 – or about December 22, 2021, I was a member of the Double Nine Grim Reapers gang. During that period, in Newburgh, New York, I participated in criminal activities in furtherance of the objectives of the gang. As a member of the gang, I participated directly and indirectly in the conduct of the affairs of the gang through a pattern of racketeering activity. Specifically, I participated in various crimes as a member of the gang, … including, on November 3rd, 2020, an attempted murder of [name deleted], a rival gang member, on Roe Street, which is the subject of Count 2 of the Indictment; on November 10, 2020, robbery of [name deleted], a marijuana dealer in the area of Lake Street Apartment Complex, which is the subject of Count 4 of the Indictment; on October 31, 2021, robbery of [name deleted], a drug dealer, on South Clark, which is the subject of Count 12 of Indictment; during 2018 through my arrest in 2021, I agreed with others to distribute and possess with intent to distribute crack cocaine, oxycodone, codeine, marijuana and K2 in Newburgh and elsewhere. Concerning Count 3 of Indictment 22 CR 641, on November 3, 2020, on Roe Street in the City of Newburgh, in furtherance of the attempted murder and assault of a rival gang member, [name deleted], I knowingly used and carried a firearm and, in furtherance of such crime, did possess a firearm and did aid and abet in the use, carrying and possession of a firearm which was discharged in the attempted murder of          . I am sorry and regret my criminal conduct.

Justice's role in the racketeering conspiracy could be fairly summarized as an active, mid-level member of the Grimz gang.

Although it makes no difference in the calculation of the Guidelines range in this case given the applicable grouping rules, the Court may consider the unjust crack versus cocaine disparity in the 3553(a) analysis[4]. The Government's recent statement, that the crack versus

---

[4] The Guidelines drug quantity offense level of 32 corresponds to §2D1.1(c)(4) for at least 3000KG but less than 10,000KG of converted drug weight. This level 32 is driven in part by the drug conversion of cocaine base from 500g to 1785.50 kg pursuant to §2D1.1 App.N. 8(D). Using the cocaine conversion instead would yield only 100kg of converted drug weight instead of 1785.50kg for crack. The Department of Justice recently announced support for the elimination of the crack versus cocaine disparity:

> The sentencing disparity was based on misinformation about the pharmacology of cocaine and its effects, and it is unnecessary to address the genuine and critical societal problems associated with trafficking cocaine, including violent crime… The disparity in federal cocaine sentencing policy has been the most visible symbol of racial unfairness in the federal criminal justice system for almost 35 years, and it is time to eliminate it.

See, Statement of the U.S. Department of Justice Before the United States Senate Committee on the Judiciary For a Hearing entitled "Examining Federal Sentencing for Crack and Powder Cocaine" (June 22, 2021). The House of Representatives has passed the "Equal Act of 2021" and

powder cocaine disparity (i) is not supported by science; (ii) has a racially disparate impact; and (iii) hinders, rather than furthers, law enforcement objectives, may warrant a downward variance pursuant to the statutory factors.

Similarly, the Court may also consider the marijuana component of the narcotics conspiracy racketeering predicate based on an amount of 15kg. This drug amount should be considered in light of society's changing laws and views of this widely used substance[5]. Sellers of legal marijuana in all states where it is legal, of course, must be licensed. Counsel is not suggesting that the marijuana sales in the instant case were legal, but rather, counsel is presenting the trends in the marijuana laws as a nature and circumstance of the offense factor, which the court may consider in determining the severity of the underlying criminal activity for which the Court will impose sentence.

### *History and Characteristics of Defendant*

The Court may consider Justice's young age at the time of his crimes, lack of guidance, lack of education, substance abuse history, positive post-arrest conduct, harsh conditions, and support from family and friends in considering a measure of leniency at sentence. Justice's mother writes about his personal history.

> I was pregnant with justice in the year 2002 he was born on            he is the youngest of my sons he was such a happy baby it's unfortunate at the age of two my children's father was sadly taking from us due to a unfortunate act of violence during which time i was pregnant with our youngest daughter who never had the chance to meet him Justice really enjoyed fishing and playing sports he played football for Newburgh pop warner anss (sic) Basketball for the Newburgh zion lions between the ages 6 to 16 justice has 6 siblings which they all get along pretty well as much as siblings do they have tight bonds with one another *See*, **Exhibit B**.

---

now this remedial legislation awaits action by the Senate. This bill eliminates the sentencing disparity between drug offenses involving crack cocaine and powder cocaine. Currently, different threshold quantities of crack cocaine and powder cocaine (e.g., 28 grams of crack cocaine and 500 grams of powder cocaine) trigger the same statutory penalties. This bill eliminates the lower quantity thresholds for crack cocaine offenses. https://www.congress.gov/bill/117th-congress/house-bill/1693.

[5] The DEA recently proposed reclassifying marijuana from a Schedule I to a Schedule III controlled substance in an acknowledgement of legitimate medical uses of marijuana which "has less potential for abuse than some of the nation's most dangerous drugs. " The United States House of Representatives on April 1, 2022 passed a bill to legalize marijuana federally. https://www.congress.gov/bill/117th-congress/house-bill/3617. The "Marijuana Opportunity Reinvestment and Expungement Act or the MORE Act" decriminalizes marijuana and "removes marijuana from the list of scheduled substances under the Controlled Substances Act and eliminates criminal penalties for an individual who manufactures, distributes, or possesses marijuana." Marijuana has been legalized in twenty states including New York. https://www.usnews.com/news/best-states/articles/where-is-marijuana-legal-a-guide-to-marijuana-legalization.

His great aunt, Sheila Jackson describes Justice's good characteristics. "Justice was always a kind, caring and loveable young man, willing to lend a hand with everything at our family gatherings. He has the most beautiful smile that touched everyone's heart to want to love him even more." **Exhibit B**. For a robust account of the history and characteristics of Justice, please see **Exhibit A**.

   (2) <u>The need for the sentence imposed</u>

      A sentence of 140 months along with a period of Supervised Release would: reflect the seriousness of the offenses, promote respect for the law, provide just punishment for his crimes for which mitigation exists, afford adequate deterrence, specifically to Jackson who has been and will continue to be incarcerated after sentence, and generally to the public which will receive a clear signal that participating in street gangs will be met with significant prison time, protect the public from further crimes of the defendant, who would likely be in his 30s upon release, and the proposed sentence would "provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner."

      The sentence recommended by counsel of 140 months imprisonment followed by 60 months of supervised release would subject Justice to the supervision of the federal criminal justice system for almost 17 years. In the event the Court imposes the proposed sentence, Justice would finish his supervised release around the year 2038 at which time he would be a mature adult in his mid-30s instead of the reckless, impulsive, dangerous teenager who joined a street gang as a 16-year-old in 2018. The sentence proposed by counsel would serve all the purposes of sentencing while simultaneously preserving a glimmer of hope for a future for Justice outside the concrete walls and steel bars of federal prison.

   (3) <u>The kinds of sentences available</u>

      A prison sentence which accounts for the extant, mitigating factors is warranted. A term of supervised release would serve as an insurance policy against future recidivism and would foster Justice's successful transition from prison to law-abiding life. Supervised Release specifically could ensure that Jackson maintains employment, stays away from drugs and bad actors in the streets.

   (4) <u>The Guidelines Sentence Range</u>

      The Guidelines range is 355 to 413 months. A Guidelines sentence here would be *Draconian*. Imposition of such a sentence would incarcerate Jackson now 21-years-old until he is in his 50s. A sentence of 140 months, along supervised release, however, would provide appropriate long-term punishment and monitoring sufficiently to protect the public and ensure that Justice steers clear of gangs, focuses on education, employment, and self-improvement without taking away three decades of his life.

(5) <u>Pertinent policy statements by Sentence Commission</u>

The Commission has issued amendments to the Guidelines along with policy statements concerning the treatment of the age of a defendant as a factor deserving consideration of a lesser sentence. The Court may consider the Commission's policy statement for Guidelines Amendment **§5H1.1** in considering an appropriate variance from the Guidelines range under the §3553(a)(5) factor. Specifically, the Commission recently set forth the following statement relevant to a young offender:

> A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation. The age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age. Age appropriate interventions and other protective factors may promote desistance from crime. Accordingly, in an appropriate case, the court may consider whether a form of punishment other than imprisonment might be sufficient to meet the purposes of sentencing[6].

(6) <u>The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct</u>

A sentence of 140 months imprisonment, although a significant variance from the applicable guidelines range, would not present any danger of any unwarranted sentence disparity given the data (or lack of data) provided in the JSIN section of the PSR. ECF 135 at 33 of 44. Additionally, none of Jackson's co-defendants have been sentenced yet.

(7) <u>The need to provide restitution to any victims of the offense</u>

"Restitution shall be ordered." PSR ¶189.

---

[6] www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202405_RF.pdf

## VI.   CONCLUSION

      Justice Jackson requests a sentence of no more than 140 months, followed by five years of supervised release, and, if warranted appropriate orders of restitution and/or forfeiture, and a mandatory $200 special assessment, which would be a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in the statute. §3553(a)(2).

Respectfully submitted,

*Daniel Hochheiser* (signature)

Daniel A. Hochheiser

Cc: AUSA Jennifer Ong